Filed 4/7/21  P. v. Alexander CA1/4

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br><br>v.<br><br>MARIO ALEXANDER,<br><br>        Defendant and Appellant. | A156739<br><br>(Humboldt County<br>Super. Ct. No. CR1601990) |

A jury convicted defendant Mario Alexander of two counts of oral copulation with a child younger than ten years old (Pen. Code,[1] § 288.7, subd. (b)) and eight counts of lewd acts on a child (§ 288, subd. (a) (section 288(a))), based on his sexual abuse of his stepdaughter, Jane Doe 2 (Doe 2), and her friend, Jane Doe 1 (Doe 1).  The jury also found true seven special allegations under the one-strike statute, section 667.61, subdivision (j)(2), that the victims were under 14 years old and that Alexander committed an offense against more than one victim.  The trial court therefore sentenced Alexander to 188 years to life in prison.

Alexander contends the trial court erred in admitting expert testimony about child sexual abuse accommodation syndrome (CSAAS) and instructing the jury on such evidence.  He further contends his sentence of 188 years to life in prison was not supported by section 667.61, subdivision (j)(2), violated

---

[1] Undesignated statutory references are to the Penal Code.

section 654's prohibition against punishing an act under more than one statute, and is an unconstitutional cruel and unusual punishment. While one of the prosecution expert's comments strayed beyond the realm of permissible CSAAS evidence, we conclude the error was harmless. We find no other statutory or constitutional error in the trial court's jury instructions or sentence and therefore affirm the judgment.

## I. BACKGROUND

### A. *Doe 2*

Doe 2, who was born in September 2006, began living with her stepfather Alexander, her mother, and her stepbrother when she was around three years old. Doe 2 went to live with her biological father in Oakhurst for her kindergarten year. On one occasion in this period, during a game of hide and seek with her cousins at her nearby paternal grandmother's house, Doe 2 found her older cousins in a closet with their pants down and they taught her something about sex. Long after this, Doe 2's paternal grandmother reported to county officials that she was concerned the cousins were engaging in sexually inappropriate behavior. The grandmother also notified Doe 2's mother of the behavior. Doe 2 later said she started copying her cousins and developed a habit of doing what they had shown her.

When Doe 2 was around five or six years old, Alexander began to touch her breasts and butt over her clothing.[2] Alexander progressed to touching her beneath her clothing but over her underwear and then to touching her skin under her clothes. Later, Alexander told Doe 2 to take off her clothes and underwear, and he touched her bare breasts and rubbed her genitals.

---

[2] In an interview in April 2016, Doe 2 said the abuse began when she was six years old. In her trial testimony in 2019, she said the abuse began when she was four or five years old.

2

This abuse occurred continuously, about once a month. On two occasions, Alexander told Doe 2 to kiss him on his mouth and shake her hand on his penis. Finally, on at least two occasions when she was nine or ten years old, Alexander told Doe 2 to put his penis in her mouth. Alexander ejaculated in her mouth at least twice. On other occasions, Alexander tried to put his penis in her butt but desisted when Doe 2 told him to stop. Alexander sometimes showed Doe 2 pornography during the abuse, and Doe 2 recalled him wearing distinctive yellow and green underwear.

To induce Doe 2 to put his penis in her mouth, Alexander promised Doe 2 he would do whatever she wanted afterwards, such as take her for ice cream or other treats. Alexander called these rewards "daddy-daughter days."[3] He also told her that if she told anyone about the abuse, Doe 2 would never see her mom or family again. When Doe 2 was around six years old, she told school officials and her mother that Alexander was abusing her. But Doe 2 later falsely recanted the allegation because Alexander had told her that she would be taken away from her family if she revealed the abuse.

After Alexander began abusing her, Doe 2 began to engage in sexual behavior with her stepbrother. She admitted she touched his penis. Doe 2's stepbrother said that Doe 2 also made him put his penis in her mouth, his mouth on her genitals, and his penis in her butt, but Doe 2 denied this. Doe 2 told her stepbrother that if he did not agree to do these things, she would falsely accuse him of something to one of their parents.

Doe 2's paternal grandmother recalled Doe 2 saying, during a short visit about a year after Doe 2 returned to live with her mother and Alexander in Humboldt County, that Doe 2 did not want to return to Humboldt County

---

[3] Although Alexander was her stepfather, Doe 2 often referred to Alexander as her father.

because a man had touched her inappropriately at a bouncy house. Doe 2's paternal grandmother claimed she told Doe 2's mother about this, but Doe 2 and her mother both denied that Doe 2 had ever said such a thing.

## B. *Doe 1*

Doe 1 was born in May 2007 and became friends with Doe 2. During the 2015 to 2016 school year, when Doe 1 was in third grade, Alexander would babysit Doe 1 at his house after school while Doe 1's mother worked. At some point, Alexander began to abuse Doe 1 during her visits to their house. One time, when she was lying on a bed, Alexander rubbed her bottom over her clothing. On another occasion, Alexander asked her to come snuggle with him while they watched a movie and he put his hands inside her pants and underwear and rubbed her bottom. On a third occasion, when Doe 1 was sleeping over in the top bunk of a bunk bed, she awoke to find Alexander spreading her knees apart. She sat up, and Alexander left.

## C. *Police investigation*

In March of 2016, Doe 1 started telling her mother she did not want to go over to Alexander's house anymore because of the food, chores, or discipline there. In April 2016, Doe 1 revealed that Alexander's abuse was the real reason why she no longer wanted to go to Alexander's house. Doe 1 and Doe 2 had already revealed the abuse to each other by that time. Doe 1 later said she did not tell her mother sooner because she was scared and Doe 2 had asked her not to, because Doe 2 was afraid she would not see Alexander again. Doe 1's mother reported the abuse to Doe 2's mother and then to the police. A social worker then conducted separate forensic interviews of Doe 1 and Doe 2 for the Child Abuse Services Team (CAST). CAST is a multi-disciplinary team that cooperates to conduct a single, videorecorded interview

4

of a child to investigate a crime, rather than require a child to be interviewed multiple times by different agencies.

The police's investigation revealed there were bunkbeds at the home where Alexander had lived with Doe 2 that would have permitted a man of Alexander's height to reach into the top bed. The police found green and yellow underwear in Alexander's bedroom, and Alexander's iPad contained evidence that it had been used to view and bookmark pornography.

### D. *Trial*

Alexander's trial commenced in January 2019, a little less than three years after the first report of Alexander's abuse. The prosecution's evidence included testimony from Doe 1 and Doe 2 and the full videos of the CAST interviews. The prosecution also called Dr. Anthony Urquiza to give testimony on CSAAS. Dr. Urquiza explained that CSAAS was developed in 1983 to describe common characteristics of children who have been sexually abused, in order to educate therapists and dispel misconceptions about abused children. Dr. Urquiza described the five components to CSAAS: (1) secrecy; (2) helplessness; (3) entrapment and accommodation; (4) delayed and unconvincing disclosure; and (5) retraction or recantation.

First, the secrecy component described how victims often remain silent about abuse because most sexual abuse is perpetrated by someone who has an ongoing relationship with the child, who is bigger and in a position of authority over the child, for whom the child has affection, and who uses threats to induce the victim not to reveal the abuse.

Second, helplessness describes how child victims of sexual abuse do not feel that they can stop the abuse because their abuser is a trusted, bigger, adult, so they generally do not try to evade or fight off their abusers.

5

Third, the entrapment and accommodation element of CSAAS refers to how victims feel trapped by their abuse and therefore cope by mentally and emotionally detaching from the experience. This leads them to appear stoic when describing the abuse, rather than crying or becoming emotional. Like victims of other kinds of trauma, victims of sexual abuse can experience reactions of depression, post-traumatic stress disorder, anxiety, and aggression. But Dr. Urquiza further stated that one behavior "that seems to be somewhat unique to kids who are sexually abused," as opposed to those who are physically abused or experience domestic violence, is engaging in age-inappropriate sexualized activity.

Fourth, CSAAS indicates that most victims delay disclosing abuse. Furthermore, while some victims may disclose everything in the first telling, others may disclose only a few details about the abuse during their first disclosure, to gauge the adult's reaction. But both groups may have inconsistencies in their stories during subsequent retellings, because they have purposefully tried to forget the details of their abuse.

Finally, CSAAS research shows that even in cases where sexual abuse is confirmed to have occurred, as many as one quarter of the child victims recant their allegations of abuse, often due to pressure from family members or lack of support for the victim.

Dr. Urquiza testified that these five components are intended to describe common aspects of child sexual abuse cases, but CSAAS is not a diagnostic tool and is not intended to be used to determine whether any particular child was abused.

The jury fund Alexander guilty of all charges against him and all the special allegations to be true. The trial court sentenced Alexander to two consecutive terms of 15 years to life in prison for the two counts of oral

copulation with a child under ten in violation of section 288.7, subdivision (b). The trial court sentenced him to a determinate sentence of eight years in prison for one of the counts of lewd act on a child in violation of section 288(a). Alexander received six consecutive sentences of 25 years to life and one concurrent sentence of 25 years to life for the other seven counts of violating section 288(a). Alexander's total sentence was therefore 188 years to life in prison.

## II. DISCUSSION

### A. *CSAAS evidence*

Alexander challenges the trial court's admission of Dr. Urquiza's CSAAS testimony as an abuse of discretion on the grounds that child sexual abuse victims' behavior is not sufficiently beyond the common experience of the jury to warrant expert testimony, CSAAS is not generally accepted within the scientific community, and Urquiza's testimony was substantially more prejudicial than probative. He also contends the admission of Urquiza's testimony violated due process for some of the same reasons. We conclude the admission of Dr. Urquiza's testimony was mostly proper but that to the extent the testimony was inadmissible, the error in admitting that portion was harmless.

### 1. Legal principles

"The governing rules are well settled. First, the decision of a trial court to admit expert testimony 'will not be disturbed on appeal unless a manifest abuse of discretion is shown.' [Citation.] Second, 'the admissibility of expert opinion is a question of degree. The jury need not be wholly ignorant of the subject matter of the opinion in order to justify its admission; if that were the test, little expert opinion testimony would ever be heard. Instead, the statute declares that even if the jury has some knowledge of the matter, expert

7

opinion may be admitted whenever it would "assist" the jury. It will be excluded only when it would add nothing at all to the jury's common fund of information, i.e., when "the subject of inquiry is one of such common knowledge that men of ordinary education could reach a conclusion as intelligently as the witness." ' " (*People v. McAlpin* (1991) 53 Cal.3d 1289, 1299–1300 (*McAlpin*).)

CSAAS testimony is not new, and numerous courts, including our Supreme Court in *McAlpin*, have already addressed its admissibility. (*McAlpin, supra,* 53 Cal.3d at pp. 1300–1301; see *People v. Julian* (2019) 34 Cal.App.5th 878, 885–886; *People v. Bowker* (1988) 203 Cal.App.3d 385.) Our Supreme Court has "ruled that CSAAS evidence 'is admissible to rehabilitate [a child] witness's credibility when the defendant suggests that the child's conduct after the incident—e.g., a delay in reporting—is inconsistent with his or her testimony claiming molestation.' [Citation.] ' "Such expert testimony is needed to disabuse jurors of commonly held misconceptions about child sexual abuse, and to explain the emotional antecedents of abused children's seemingly self-impeaching behavior." ' [Citation.] Such evidence 'is not admissible to prove that the complaining witness has in fact been sexually abused.' [Citation.] 'The expert is not allowed to give an opinion on whether a witness is telling the truth . . . .' " (*People v. Munch* (2020) 52 Cal.App.5th 464, 468 (*Munch*).)

## 2. Admissibility of CSAAS evidence

Alexander first argues we should depart from *McAlpin* and hold CSAAS evidence like Dr. Urquiza's inadmissible because the circumstances in society have changed since *McAlpin* was decided. He contends CSAAS evidence is no longer necessary because the prevalence of child sexual abuse

8

has become public knowledge and jurors no longer need expert testimony to explain why a child might delay reporting abuse or recant a report.

Alexander cites no factual authority for his assertions, nor does he explain how they would allow us to disregard a directly applicable precedent from a higher court. (Cf. *Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455.)

In any event, Alexander's assertions do not cause us to question *McAlpin*'s holding. Expert testimony is admissible even though a jury may have some knowledge of a topic, so long as the expert's testimony would assist the jury. (*McAlpin*, *supra*, 53 Cal.3d at pp. 1299–1300.) Even if the jury here were more familiar with child sexual abuse than a jury would have been at the time of *McAlpin*, Alexander has not shown that the jury was equally familiar with the behavior of child sexual abuse victims as Dr. Urquiza. The trial court could therefore reasonably conclude his expert testimony would be helpful. (See *Sargon Enterprises, Inc. v. University of Southern California* (2012) 55 Cal.4th 747, 773 ["A ruling that constitutes an abuse of discretion has been described as one that is 'so irrational or arbitrary that no reasonable person could agree with it' "].)

Alexander also points out that Doe 1 and Doe 2 explained why they delayed reporting and why Doe 2 recanted her initial report, arguing this shows there was no need for Dr. Urquiza to explain their behavior. He contends that their explanations, combined with the now-prevalent public understanding of sexual abuse, mean Dr. Urquiza's testimony was substantially more prejudicial than probative. However, the trial court could reasonably decide that without the context Dr. Urquiza provided indicating that children often delay, recant, and engage in sexual behavior, the jury might harbor misconceptions that needed to be dispelled. This is not to say

9

that Dr. Urquiza was vouching for the witnesses, as Alexander argues. Instead, Dr. Urquiza simply helped dispel any misconceptions the jury may have had about how an abused child would usually act, so that the jury could make the ultimate credibility determination of whether Doe 1 and Doe 2 were telling the truth.

Second, Alexander contends Dr. Urquiza's CSAAS testimony should not have been admitted because CSAAS is not generally accepted as a basis for determining whether a child was abused and therefore fails the *Kelly*/*Frye* test for admissibility of scientific evidence. (*People v. Kelly* (1976) 17 Cal.3d 24; *Frye v. United States* (D.C.Cir. 1923) 293 F. 1013.) " 'Under the *Kelly*/*Frye* test, when expert testimony based on a new scientific technique is offered, the proponent of the testimony must first establish the reliability of the method and the qualifications of the witness. "Reliability of the evidence is established by showing 'the procedure has been generally accepted . . . in the scientific community in which it developed . . . .' " ' " (*Munch*, *supra*, 52 Cal.App.5th at p. 472.) Alexander cites some decisions from other states that have held CSAAS is inadmissible under this sort of test, as well as a study calling into question the validity of using CSAAS to distinguish abused from non-abused children. (See, e.g., *State v. JLG* (N.J. 2018) 190 A.3d 442, 456–458; Zajac et al., Misconceptions About Childhood Sexual Abuse and Child Witnesses: Implications for Psychological Experts in the Courtroom (2013), 21 Memory 1, 2.)

Dr. Urquiza repeatedly and expressly rejected the idea that CSAAS could or should be used to diagnose or determine whether any particular child was in fact abused. For example, Dr. Urquiza unambiguously testified on cross-examination that CSAAS should not be used to determine whether a particular alleged abuser was guilty. It is therefore irrelevant whether

CSAAS would need to pass the *Kelly*/*Frye* test to be used for such impermissible purposes. Moreover, as *Munch* recently noted in rejecting similar arguments, "[t]he CSAAS evidence [Alexander] challenges has been ruled to be properly admitted by the courts of this state for decades." (*Munch*, *supra*, 52 Cal.App.5th at p. 472.) Because we are not confronting new scientific evidence, the *Kelly*/*Frye* test does not apply. (*Ibid*.; see *People v. Harlan* (1990) 222 Cal.App.3d 439, 448–449 [*Kelly*/*Frye* rule does not apply to CSAAS opinion based on expert's clinical experience and professional literature].) We agree with these cases and see no reason to depart from them, as Alexander urges us to do.

Alexander's third argument relies on due process and follows similar lines to his *Kelly*/*Frye* argument. He maintains Dr. Urquiza's CSAAS evidence invaded the jury's province or relieved the prosecution of the burden of proof because it allowed the jury to rely on the CSAAS evidence to find Alexander guilty even though CSAAS is not a reliable indicator of abuse. Again, because Dr. Urquiza rejected the use of CSAAS to diagnose or detect abuse, this argument fails. This case is therefore unlike *People v. Julian*, *supra*, 34 Cal.App.5th at page 886, on which Alexander relies. Dr. Urquiza testified in that case as well and told the jury that false allegations of sexual abuse are rare, occurring only in 1 percent to 8 percent of cases. (*Id.* at pp. 883–884.) *Julian* held Dr. Urquiza's statistical evidence was inadmissible because it invited the jury to use statistics to predict the likelihood of the defendant's guilt. (*Id.* at p. 886; accord, *People v. Wilson* (2019) 33 Cal.App.5th 559, 568–571.) Unlike in *Julian*, Dr. Urquiza eschewed any such probabilistic or predictive testimony. His testimony reflects the longstanding prohibitions against using CSAAS as indicative of any particular defendant's guilt, so the CSAAS evidence as a whole did not invade

11

the jury's province or relieve the prosecution of its burden. (See *People v. Bowker*, *supra*, 203 Cal.App.3d at pp. 393–394.)

### 3. Dr. Urquiza's testimony in this case

A common thread within all three of Alexander's CSAAS arguments is his position that even if CSAAS evidence were admissible in some form, Dr. Urquiza's testimony far exceeded the boundaries of permissible CSAAS evidence. Alexander highlights Dr. Urquiza's testimony about the background facts supporting the CSAAS findings, such as his observation that most children are sexually abused by someone they know who is bigger, older, in a position of authority, and with whom the children have an ongoing relationship. Dr. Urquiza also described how children often keep quiet because of their affection for their abusers and their own shame and embarrassment, as well as the abusers' threats and intimidation. Dr. Urquiza further testified that sexually abused children, like other types of abused children, may become depressed, anxious, or aggressive, and that one behavior that is "somewhat unique" to sexually abused children is age-inappropriate sexual behavior. Alexander contends that this testimony corresponded so closely with the facts of his case that it virtually compelled the jury to apply CSAAS to his case and conclude he was guilty because of Doe 1's and Doe 2's behavior.

For the most part, we disagree. Dr. Urquiza's testimony largely repeated the concepts of CSAAS, which *McAlpin* held is admissible. His recitation of the common circumstances for child abuse was necessary to understand the CSAAS components that children may not report abuse immediately and may later recant an accusation of abuse. Dr. Urquiza was not tailoring this testimony to this case or presenting general testimony in a way that invited the jury to apply it to the facts of this case. Indeed, as

12

mentioned above, Dr. Urquiza specifically agreed that CSAAS should not be used diagnostically. It was also not possible for him to tightly tailor his testimony to Alexander because, as he explained in an admissibility hearing outside the presence of the jury, the only things he knew about this case were that there were two victims who knew each other and that there was a family relationship between at least one victim and Alexander. Nor did the prosecution ask Dr. Urquiza any hypothetical questions based on the facts of this case. To the extent that there is any similarity between Dr. Urquiza's description of CSAAS and the evidence at Alexander's trial, that similarity reflects that Alexander's behavior followed a common pattern of abuse. If Alexander were correct that a similarity between the facts of a case and the common circumstances giving rise to CSAAS were a basis to exclude such evidence, it would mean that CSAAS would be less admissible the more likely it was to explain a victim's behavior, which would be nonsensical.

We agree with Alexander, however, that one aspect of Dr. Urquiza's testimony exceeded the bounds of appropriate CSAAS evidence. Dr. Urquiza testified that one behavior that "seems to be somewhat unique" to sexually

abused children is age-inappropriate sexualized behavior.[4]  On its face, this statement could be interpreted, as Alexander does, to mean that such behavior could be used to determine whether a child has been sexually abused.  The prosecutor invited the jury to interpret this statement in just this fashion in her rebuttal during closing arguments.  She told the jury that Doe 2's sexual behavior with her stepbrother was "[a] unique coping strategy" and was "perfectly consistent with a coping strategy known to be unique to children who have suffered child sexual abuse.  Sexual acting out inappropriate for their age after they've been abused."  Moments later, the prosecutor emphasized that Doe 2 dealt with the abuse by acting out, which was "[a] unique coping strategy."  Thus, the prosecutor encouraged the jury to construe Dr. Urquiza as opining that age-inappropriate sexualized behavior can reveal whether a particular child was sexually abused.

---

[4] Dr. Urquiza testified, "There are actually a lot of different coping strategies.  Most of them, not all of them, but most of them tend to be coping strategies that are not unique to being sexually abused.  We see lots of kids who are sexually abused who have problems with mood and get depressed, or problems of anxiety, sometimes related issues like PTSD, sometimes they become aggressive, but those are the kinds of things we see with lots of kids.  You can be physically abused, you can come from a family where there is a lot of domestic violence, and you may have some of those things like aggression or depression or anxiety.  The one that seems to be somewhat unique to kids who are sexually abused is inappropriate sexualized behavior.  We don't usually see sexually inappropriate—age inappropriate sexualized behavior.  That is a mouthful.  We don't see that in kids who are involved in domestic violence or exposed to domestic violence.  What we do usually see is that those types of kids as a means to cope with this knowledge or experience that they don't understand may engage in sexually inappropriate behavior in a school setting, may have early onset of sexual behavior with a boyfriend much younger than perhaps they should.  Really it is a means to try to struggle with the knowledge and experience of sexual victimization that they don't fully understand."

This was improper. Dr. Urquiza's statement allowed, and the prosecutor encouraged, members of the jury to cross the line between using CSAAS evidence to dispel misconceptions they may have had about common behavior of sexually abused children, which is permissible, and using CSAAS evidence to conclude that Doe 1 and Doe 2 were in fact abused, which is not.

Alexander contends the prejudicial effect of this improper testimony should be evaluated under the federal standard of whether it was harmless beyond a reasonable doubt (*Chapman v. California* (1967) 386 U.S. 18, 24), but that the error was prejudicial even under the state standard of whether "it is reasonably probable that a result more favorable to the appealing party would have been reached in the absence of the error" (*People v. Watson* (1956) 46 Cal.2d 818, 836). The state standard governs here. (*People v. Wilson*, *supra*, 33 Cal.App.5th at pp. 571–572.)

To begin with, Dr. Urquiza's statement on its own merely permitted, but did not require, the jury to use it improperly. While the statement is susceptible to the interpretation that Alexander adopts, the qualifiers "seems" and "somewhat" undercut the impression that age-inappropriate sexualized behavior can be used diagnostically, since they indicate only that such behavior occurs more often in sexually abused children. Interpreted this way, Dr. Urquiza's statement is consistent with the studies Alexander cites regarding the frequency of sexual behavior problems in children. In addition, the full context of Dr. Urquiza's testimony reveals that he was not comparing sexually abused children to all children, but was instead comparing sexually abused children to children who experienced physical abuse or domestic violence, who usually do not display such sexualized behavior. The prosecutor accurately summarized his testimony in these terms in her initial closing argument.

15

To draw an improper inference of guilt from Dr. Urquiza's comment about "somewhat unique" behavior of sexually abused children, the jury also would have had to disregard Dr. Urquiza's testimony regarding the proper use of CSAAS evidence. Dr. Urquiza testified on direct examination that CSAAS could not be used to distinguish between true and false claims of abuse because such use would "sort of work[] backwards from the idea of the diagnosis." Alexander contends this correct statement is insufficient to dispel the possibility of prejudice, because Dr. Urquiza also said that it was the jury's place, not the place of science, to make a determination of guilt. Alexander construes this latter statement as implying that CSAAS evidence could indicate guilt but for the legal rules prohibiting it from doing so, thereby inviting the jury to use CSAAS in the way the law prohibited. We do not so construe this testimony. But in any event, Alexander's own attorney elicited clear admissions from Dr. Urquiza on cross-examination that CSAAS should not be used to determine whether an abuser was guilty. Dr. Urquiza also admitted the progenitor of CSAAS had criticized its use by lawyers and courts to indicate guilt or innocence, and Dr. Urquiza agreed that such use would be inappropriate. Alexander's counsel emphasized these points in his closing argument. And as we explain below, the trial court properly instructed the jury on the limits of the use of CSAAS evidence. We assume the jury understood and followed this instruction. (*People v. Coffman and Marlow* (2004) 34 Cal.4th 1, 107.)

Finally, and most importantly, eliminating Dr. Urquiza's remark about "somewhat unique" behavior (or even his CSAAS testimony as a whole) would not have changed the outcome of the trial because of the strength of the prosecution's case. There were two victims, whose testimony generally corroborated one another and was mostly consistent with their forensic

16

interviews. Doe 2's interview, a video of which was played for the jury, was particularly compelling. It showed an eight-year-old girl frankly describing sexual acts in graphic detail, including descriptions of the color and consistency of semen, but with the language, mannerisms, and demeanor of a young child.

The police found evidence corroborating Doe 2's testimony. She stated in her forensic interview that Alexander showed her pornography on a tablet, and the police found evidence of pornography being viewed and bookmarked on Alexander's iPad. Doe 2 also described in detail certain distinctive yellow and green underwear Alexander wore during the abuse, and the police found underwear matching that description when they searched Alexander's bedroom when he was arrested. Alexander is correct that Doe 2's knowledge of Alexander's underwear is not strong corroboration, given that they lived in the same home. Alexander also notes that it is not unusual for an adult to view pornography. But Alexander offers no reason why Doe 2 would have known of the pornography on Alexander's device or been able to describe the acts depicted in it. The police likewise corroborated Doe 1's testimony that an adult of Alexander's height could reach into the top bunk bed as Doe 1 described.

Alexander's defense was comparatively weak. He tried to call into question the credibility of the two witnesses by highlighting small inconsistencies in each of their stories and between their trial testimony and forensic interviews. For example, Doe 1 testified that she had never told her mother that the reason she did not want to go to Alexander's house was because of the food he served, though Doe 1's mother remembered such a conversation. Doe 1 also testified at trial that she did not remember the incident in which Alexander asked her to snuggle and then put his hands in

17

her pants, even though she described it in her CAST interview. Similarly, Doe 1 testified at trial that Alexander never touched her vagina and that she had never said he had, but Doe 2 said in her forensic interview that Doe 1 had reported Alexander doing this. Doe 2's grandmother testified that Doe 2 had said, about a year after spending her kindergarten year with her biological father, that a man had touched her at a bouncy house, while Doe 2 denied making this statement.

These inconsistencies are both minor and unsurprising. The girls were eight and nine years old at the time of their forensic interviews, and the trial took place almost three years later. Even adults' memories of specific details can fade over such a span of time. For example, Doe 2's mother did not recall anything about Doe 2's allegation of a man touching her at a bouncy house, even though Doe 2's grandmother said she had promptly informed Doe 2's mother about Doe 2's statement.

Alexander believed Doe 1 was motivated to lie simply because she did not like having to go to the Alexander household after school because of Alexander's discipline and the food he made her eat. Alexander's counsel admitted, however, that this motive seemed simplistic, and the theory seems farfetched. As for Doe 2, Alexander's counsel admitted it was difficult to know why she would lie.

Alexander's defense otherwise centered on the theory that Doe 2 witnessed her cousins engage in sexual behavior while visiting with them at her grandmother's house during her kindergarten year, Doe 2 repeated that behavior with her stepbrother, and she then used those acts as the basis for her allegations against Alexander. However, the only evidence about the nature of the cousins' sexual behavior was Doe 2's statements during her CAST interview that she saw them go into a closet and pull down their pants

18

during a game of hide and seek, and she developed a habit of repeating the behavior her cousins had shown her before Alexander began touching her.[5] Doe 2's grandmother also testified that she later became concerned about sexual behavior by the cousins so she contacted her county's child welfare services office and informed Doe 2's mother. The grandmother informed Doe 2's mother on the instructions of the child welfare services office, even though the grandmother's concerns arose, by her description, "long after" and "years" after Doe 2 had last seen the cousins. Given the time separation between the cousins' concerning behavior and the lack of any detail as to specific behavior the cousins may have engaged in with Doe 2, Alexander's theory based on the cousins remains speculative.

By contrast, Doe 2's stepbrother's description of her acts with him did mirror Doe 2's descriptions at trial and in her forensic interview of Alexander's acts with her. These similarities are more logically explained by her repeating Alexander's abuse with her stepbrother than by her repeating some unknown behaviors of her cousins'. Doe 2 testified that her behavior with her stepbrother occurred after Alexander began touching her. Alexander has never attempted to call this sequence into question.

Alexander also pointed out that Doe 1 may have taught Doe 2 about something they called "popping the girl part," in which Doe 1 would cross her legs and squeeze her butt while making sexual noises. Alexander's counsel theorized this act was a form of masturbation and contended it was evidence of Doe 1's sexualization. But since this behavior had no apparent relationship to the acts the girls described Alexander committing or Doe 2's behavior with her stepbrother, this alternative sexualization theory seems even less substantial and provided little support to Alexander's defense.

---

[5] Doe 2 could not remember anything about this incident at trial.

Given this state of the evidence, we do not agree with Alexander's contention that, absent Dr. Urquiza's brief testimony about "somewhat unique" sexualized behavior, at least one juror would have had a reasonable doubt about Alexander's guilt. The prosecution presented strong and compelling evidence supporting the charges and Alexander offered no credible explanation for the witnesses' testimony or any substantial reason not to believe their allegations.

## B.    *Jury instructions on CSAAS evidence*

Alexander next argues that the trial court prejudicially violated his due process protections and the Sixth Amendment to the United States Constitution by instructing the jury on CSAAS evidence using CALCRIM No. 1193.[6] He finds fault with the court's instruction that the jury could use Dr. Urquiza's CSAAS evidence "only in deciding whether or not Jane Doe

---

[6] The trial court's full CALCRIM No. 1193 instruction was: "You've heard the testimony from Dr. Anthony Urquiza regarding Child Sexual Abuse Accommodation Syndrome. Dr. Anthony Urquiza's testimony about Child Sexual Abuse Accommodation Syndrome is not evidence that the defendant committed any of the crimes charged against him. You may consider this evidence only in deciding whether or not Jane Doe Number 1 and Number 2—their conduct was not inconsistent with the conduct of someone who has been molested in evaluating—and in evaluating the believability of their testimony."

We note that Alexander, like the prosecutor, requested this instruction, raising the question of invited error. However, "[t]he invited error doctrine will not preclude appellate review if the record fails to show counsel had a tactical reason for requesting or acquiescing in the instruction." (*People v. Moon* (2005) 37 Cal.4th 1, 28.) The record here does not reveal whether Alexander's counsel had any tactical reason for requesting this instruction. In any event, even if Alexander's counsel had invited the error he now complains of, we would still examine the issue to forestall a claim of ineffective assistance of counsel. (*People v. Riazati* (2011) 195 Cal.App.4th 514, 530.)

20

Number 1 and Number 2—their conduct was not inconsistent with the conduct of someone who has been molested . . . and in evaluating the believability of their testimony." He argues this relieved the prosecution of its burden of proof because the case against him relied solely on the complaining witnesses' testimony, so that the issue of the witnesses' credibility is indistinguishable from the truth of the charges against him.

"An appellate court reviews the wording of a jury instruction de novo and assesses whether the instruction accurately states the law. [Citation.] In reviewing a claim of instructional error, the court must consider whether there is a reasonable likelihood that the trial court's instructions caused the jury to misapply the law in violation of the Constitution. [Citations.] The challenged instruction is viewed 'in the context of the instructions as a whole and the trial record to determine whether there is a reasonable likelihood the jury applied the instruction in an impermissible manner.' " (*People v. Mitchell* (2019) 7 Cal.5th 561, 579.)

As Alexander acknowledges, *People v. Gonzales* (2017) 16 Cal.App.5th 494 (*Gonzales*) considered and rejected an argument identical to his. The court there reasoned that CALCRIM No. 1193 had to be understood in the context of the CSAAS expert's testimony that CSAAS could not be used to diagnose or determine whether a child was in fact abused, but merely to understand the reactions of a child who has been abused. (*Id.* at pp. 503–504.) *Gonzales* determined a reasonable juror would understand from the instruction that the "CSAAS evidence simply neutralizes the victim's apparently self-impeaching behavior. Thus, under CALCRIM No. 1193, a juror who believes [CSAAS] testimony will find both that [the complaining witness's] apparently self-impeaching behavior does not affect her believability one way or the other, and that the CSAAS evidence does not

21

show she had been molested.  There is no conflict in the instruction." (*Id.* at p. 504.)

Alexander maintains *Gonzales* was wrongly decided, but we find the decision persuasive and reach the same conclusion.  CALCRIM No. 1193 accurately sets forth the rules discussed above regarding the use of CSAAS evidence.  It did not allow the jury to find Alexander guilty based on Dr. Urquiza's testimony alone, but merely allowed the jury, if it found the CSAAS evidence itself believable, to evaluate the complaining witnesses' testimony without being blinded by preconceptions about how child sexual abuse victims would normally act.  *Gonzales'* remark about CSAAS neutralizing self-impeaching behavior is apt.  (*Gonzales*, *supra*, 16 Cal.App.5th at p. 504.)  The trial court's use of the CALCRIM No. 1193 only permitted the jury to use CSAAS evidence to determine whether Doe 1's and Doe 2's behavior was "not inconsistent" with the allegations, and did not allow the jury to determine from it alone whether the witnesses were telling the truth.  The jury still had to determine for itself whether the witnesses' testimony was credible, such as by assessing their demeanor or looking for corroboration with the other evidence.

## C.    *Consecutive life terms*

Alexander next argues the trial court erred in imposing seven consecutive life sentences under section 667.61.  This statute, which has been called the one-strike law, "creates an alternative, harsher sentencing scheme of either 15 or 25 years to life for certain enumerated sex offenses accompanied by additional specified factual findings." (*People v. Zaldana* (2019) 43 Cal.App.5th 527, 531 (*Zaldana*), review granted Mar. 18, 2020, S259731.)  Commission of a lewd act against a child under the age of 14 in violation of section 288(a), which provided the basis for seven of Alexander's

charges, is one of the enumerated offenses eligible for a sentence under section 667.61. (§ 667.61, subd. (c)(8).)[7] One of the specified factual findings necessary for an enhanced sentence under section 667.61 is that the defendant is convicted in the same case of committing one of the enumerated offenses against more than one victim. (§ 667.61, subd. (e)(4).) Because the jury found Alexander violated section 288(a) and found the additional fact that Alexander committed this qualifying offense against more than one victim, the court sentenced Alexander under section 667.61, subdivision (j)(2) to 25 years to life in prison for each of his convictions for violating section 288(a) for which the sentencing enhancement was alleged.

Alexander argues his sentence was improper because section 667.61 only permits one life term per victim. Alexander presents several different theories for why this is so, but none of his arguments is new. Indeed, "[e]very court that has ever considered this issue has rejected [the] contention that section 667.61 does not permit multiple life terms to be imposed based on the multiple-victims circumstance," as Alexander acknowledges. (*Zaldana*,

---

[7] Section 667.61 was amended after the events in this case transpired, but not in any way relevant to Alexander's arguments. (Stats. 2018, ch. 423, § 68.) For simplicity we cite to the current version of the statute.

*supra*, 43 Cal.App.5th at p. 531.)[8]  "We need not repeat the thorough analysis set forth in these cases, except to say we agree with their reasoning."  (*Ibid.*) For the reasons set forth in more detail in *Zaldana* and the cases on which it relied, we reject Alexander's contentions and affirm the trial court's decision to sentence Alexander to multiple life terms under section 667.61, subdivision (j)(2).[9]

## D.    Section 654

In addition to challenging his seven life terms as not being supported by section 667.61, Alexander believes five of those life terms must be stayed because they violate the proscription on multiple punishments under section 654.  Section 654, subdivision (a) states in pertinent part, "An act or omission that is punishable in different ways by different provisions of law shall be punished under the provision that provides for the longest potential term of imprisonment, but in no case shall the act or omission be punished under

---

[8] The Supreme Court granted review in *People v. Zaldana*, to consider whether due process requires the prosecution to plead a one-strike sentencing enhancement under section 667.61, subdivision (j)(2) in order for a court to impose such punishment on a defendant.  (*People v. Zaldana* (2020) 460 P.3d 262 [granting review and deferring briefing pending resolution of *In re Vaquera* (2019) 39 Cal.App.5th 233, review granted Nov. 26, 2019, S258376]; see California Supreme Court, Issues Pending Before The California Supreme Court In Criminal Cases at p. 8,  at <https://www.courts.ca.gov/13648.htm> [as of April 5, 2021][describing issues in *In re Vaquera* as concerning that decision's disagreement with *People v. Jimenez* (2019) 35 Cal.App.5th 373, which in turn held that failure to plead section 667.61, subdivision (j)(2) enhancement violates due process]).)  The information here pled the enhancement under section 667.61, subdivision (j)(2), so this case does not implicate the grant of review in *Zaldana* and *Vaquera*.

[9] Because we agree with *Zaldana* and its predecessors that section 667.61 is not ambiguous under the plain language of the statute, we have no need to resort to the rule of lenity, as Alexander urges.

more than one provision." Alexander contends this limitation applies to sentences under section 667.61 because they are like enhancements, to which section 654 can apply under *People v. Ahmed* (2011) 53 Cal.4th 156, 163 (*Ahmed*). He further argues that his multiple life terms under section 667.61 violate section 654 because they punish him twice for the same aspect of criminal conduct. In other words, he argues that his acts against Doe 1 were punished in their own counts and then also punished again when they were used to enhance the sentences for his acts against Doe 2, and vice versa.

We do not agree that section 654 applies to Alexander's sentence under section 667.61. The Supreme Court in *Ahmed* explained that there are two categories of enhancements—those that go to the nature of the offender and those that go to the nature of the offense—and section 654 only applies to the latter kind of enhancements. (*Ahmed, supra*, 53 Cal.4th at pp. 161–162.) Furthermore, the Supreme Court held that section 654 does not apply when another, more specific sentencing statute indicates whether multiple enhancements can be imposed. (*Id.* at p. 163.)

Alexander's application of section 654 to section 667.61 fails to clear both of the *Ahmed* hurdles. As discussed above, section 667.61 allows a court to sentence a defendant to multiple life terms for crimes against multiple victims on multiple occasions. Because section 667.61 already specifically answers the question Alexander raises regarding multiple life sentences, the more general rule in section 654 does not control. (*Ahmed, supra*, 53 Cal.4th at p. 163.) Moreover, the multiple victim enhancement under section 667.61 relates to the nature of the offender, not the offense. As one court explained, "in making multiple convictions for violent sex offenses punishable by multiple life sentences [under section 667.61], the Legislature was expressing the view that multiple violent sex offenses deserve more severe punishment

than a single violent sex offense *because of the predatory nature of the perpetrator.*" (*People v. Murphy* (1998) 65 Cal.App.4th 35, 41, italics added.) We agree with this assessment. Section 667.61 does not punish a defendant for two crimes at once. Instead, it punishes for a single crime a defendant whom the Legislature has determined is more dangerous because of his willingness to harm more than one person. (*People v. DeSimone* (1998) 62 Cal.App.4th 693, 700 [sentence based on multiple victim circumstance under § 667.61 does not violate § 654 because it is based on a defendant's status as a repeat offender].) This determination is apt with regard to Alexander, whose molestation of Doe 1 demonstrates a willingness to prey on a wider category of children than those within his immediate family.[10]

Alexander further contends the Legislature's determination to punish multiple sex offenses more severely is fully implemented by imposing a single life term per victim, so only one life term per victim can be imposed. Alexander provides no authority for this assertion. Nor does he explain how he or we could determine whether the Legislature's reasons for imposing a more severe punishment have been fully implemented, or why the Legislature must stop at the bare minimum punishment that would implement its goal. Our best guide to the Legislature's intent is the relevant statutes themselves, which offer no reason to read section 654 as preventing the trial court from imposing multiple life sentences against Alexander under section 667.61.

---

[10] *People v. Andrade* (2015) 238 Cal.App.4th 1274, 1308–1309, held that section 654 did not bar the imposition of multiple life terms under section 667.61 on a defendant who committed multiple criminal acts on separate occasions, rather than one course of conduct with a single intent and objective. (*Ibid.*) Because he does not argue his offenses against Doe 1 and Doe 2 were incident to one objective, *Andrade* is of no aid to Alexander.

### E. Cruel and unusual punishment

In his last argument, Alexander argues his sentence for eight violations of section 288(a) and two violations of section 288.7 is de facto a sentence of life without possibility of parole and therefore is unconstitutionally cruel and unusual under the federal and state constitutions. The Eighth Amendment to the United States Constitution and article I, section 17 of the California Constitution both prohibit the infliction of cruel and unusual punishments. As applied to punishments of imprisonment, the Eighth Amendment contains a " 'narrow proportionality principle,' that 'does not require strict proportionality between crime and sentence' but rather 'forbids only extreme sentences that are "grossly disproportionate" to the crime.' " (*Graham v. Florida* (2010) 560 U.S. 48, 59–60.) The Supreme Court has instructed that this principle is "applicable only in the 'exceedingly rare' and 'extreme' case." (*Andrade v. Lockyer* (2003) 538 U.S. 63, 73.) Under the California Constitution, a punishment may be cruel or unusual if "it is so disproportionate to the crime for which it is inflicted that it shocks the conscience and offends fundamental notions of human dignity." (*In re Lynch* (1972) 8 Cal.3d 410, 424.) Though the standards are formulated somewhat differently, the tests for whether a punishment violates these provisions are fairly similar. We must (1) consider the severity of the sentence and the nature of the offense and the offender, with regard to the danger both offense and offender pose to society; (2) compare the sentence with the sentences imposed for other crimes in the same jurisdiction; and (3) compare the sentences for the same crime in other jurisdictions. (*Graham*, at p. 60; *Lynch*, at pp. 425–427.)

Our consideration of these factors is hampered by the fact that Alexander, despite correctly stating the tests, has offered no analysis

regarding the sentences in other jurisdictions for the same crimes. It is Alexander's burden to prove his sentence is unconstitutional. (*People v. King* (1993) 16 Cal.App.4th 567, 572.) Accordingly, we interpret his failure to complete the necessary analysis as a concession that his sentence is not disproportionate when compared with similar offenses in other states. (*People v. Reyes* (2016) 246 Cal.App.4th 62, 89.) This is fatal to his claim under the Eighth Amendment. (See *Graham, supra,* 560 U.S. at p. 59 [comparison to different offenses and the same offense in different states "validate[s]" an initial finding of unconstitutionality based on examining the offense and punishment].) However, because a defendant need not necessarily show disproportionality under the California Constitution in comparison to other states' punishments, we will examine Alexander's argument. (*People v. Norman* (2003) 109 Cal.App.4th 221, 230.)

Alexander's analysis consists primarily of a comparison the facts of his case to those in *People v. Christensen* (2014) 229 Cal.App.4th 781 (*Christensen*). There, the 30-year-old defendant was convicted of five counts of committing a lewd or lascivious act on three different boys under the act of 14 and sentenced to 27 years to life in prison. (*Id.* at pp. 803–804.) *Christensen* found this sentence was constitutional. (*Id.* at p. 787.) The court concluded that after considering the spectrum of offenses ranging from murder, mayhem, and torture to petty theft, "lewd conduct on a child may not be the most grave of all offenses, but its seriousness is considerable. It may have lifelong consequences to the well-being of the child." (*Id.* at p. 806.) The court noted that the defendant committed five offenses against three boys and one of the defendant's victims remained, years later, in a mental and emotional state so severe that he was on the verge of being placed in a 24-hour care facility. (*Ibid.*) *Christensen* also pointed out that the defendant,

who worked at an after-school program at a school, acted alone and violated a position of trust by preying on boys placed in his care over a period of several years, brazenly molesting them in public spaces and engaging in more serious acts when the opportunity arose. (*Id.* at p. 807.) *Christensen* recognized that the defendant had no criminal record, but it found this was a matter of happenstance, given that the abuse lasted years, and was in any event not determinative. (*Ibid.*)

Alexander contrasts the facts of this case with *Christensen* by noting that there is no evidence that his offenses had the same kind of "devastating impact" as the need for 24-hour care for one of the victims in *Christensen*. (*Christensen, supra*, 229 Cal.App.4th at p. 806.) He further observes that the defendant in *Christensen* would be eligible for parole when he was 53, while Alexander's sentence allows no realistic possibility of parole. (*Id.* at pp. 803–804.) Alexander also emphasizes that his offenses were not forcible, unlike other cases where defendants received de facto or de jure sentences of life without possibility of parole. (See, e.g., *People v. Reyes, supra*, 246 Cal.App.4th at pp. 69–70.)

A comparison between this case and *Christensen* and other authorities cited by Alexander does not persuade us that Alexander's sentence is unconstitutional. At the outset, we note that *Christensen* nowhere indicated that the sentence of 27 years to life represented the outer limit of constitutionality, nor did any of the rest of Alexander's authorities. (See, e.g., *People v. Baker* (2018) 20 Cal.App.5th 711, 722–733.) Thus, even if Alexander's conduct were less serious than the defendant's in *Christensen*, that would not necessarily mean Alexander's sentence is unconstitutional. In any event, the differences Alexander highlights between *Christensen* and this case are not significant when considered in the larger context of Alexander's

offenses. We agree with *Christensen* that lewd conduct on a child, like that which Alexander committed on multiple occasions, is inherently of "considerable" seriousness and "may have lifelong consequences to the well-being of the child." (*Christensen*, *supra*, 229 Cal.App.4th at p. 806.) It does not matter that the victim in *Christensen* was on the verge of requiring round-the-clock care while there is no evidence of such effects in this case. The effects and ramifications that necessarily accompany the acts of child molestation that Alexander committed are significant even if the victims manage to avoid the need for 24-hour professional care. Doe 2 submitted a statement describing how Alexander prevented her from having a childhood, ruined her life, and destroyed most of her friendships. This evidence, together with a common sense understanding of the effects of child molestation, confirms that Alexander's offenses were serious.

Furthermore, although Alexander preyed on only two girls, rather than the three victims in *Christensen*, Alexander was charged with ten counts covering a lengthy period of abuse. Alexander's course of conduct lasted years, like the defendant in *Christensen*, but unlike the three isolated incidents charged there, Alexander was convicted of ten acts of abuse, and he abused Doe 2 continuously, on a monthly basis. The repeated nature of the abuse distinguishes Alexander's case from the rest of the cases he cites, none of which involved this many instances over this long a time period (and, again, none of which found a sentence unconstitutional). (See, e.g., *People v. Reyes*, *supra*, 246 Cal.App.4th 62, at pp. 68–70 [sentence of life without parole for count of forcible rape of a 14-year old during a burglary].) His behavior with Doe 2, progressing from less serious acts of touching her over her clothes to acts of oral copulation and attempts at intercourse, also demonstrates a predatory nature, just as did the *Christensen* defendant's

30

progression from acts of touching the first two boys while in public places to acts of oral copulation with a third boy in a private setting. (*Id.* at pp. 787, 807.) Alexander's willingness to expand the scope of his abuse to include Doe 1, a girl outside his family, confirms this predation. And like the defendant in *Christensen*, Alexander exploited a similar position of trust, as he preyed on his own stepdaughter and on a girl placed in his care after school by her mother. Although Alexander's offenses were not forcible, we cannot agree that this is a relatively mild one-strike case, as Alexander asserts. Alexander's punishment is undoubtedly severe, since the lengthy term of years before he becomes eligible for parole means he will effectively be in prison for life without parole. But a sentence of life without parole for repeated acts of abuse against two very young and vulnerable victims, increasing in severity over a span of years and expanding in scope, does not strike us as beyond the pale, and nothing in *Christensen* or the rest of Alexander's authorities persuades us to the contrary.

In addition to contrasting this case with *Christensen*, Alexander contends his sentence is unduly harsh when considered in light of his personal circumstances. He emphasizes that he had a difficult childhood and spent time in foster homes; suffered from post-traumatic stress disorder, depression, and anxiety; has a long history of substance abuse; and was assessed as having a low risk of reoffending. He admits that he received an "Other than Honorable Discharge" from the military based on a pattern of misconduct, but he contends the military distorted the facts in order to discharge him. He also points out that his only prior criminal offense was a conviction for drug manufacture or distribution, in violation of Health and Safety Code section 11366.6, subdivision (a).

These facts do not demonstrate that Alexander's sentence "shocks the conscience and offends fundamental notions of human dignity." (*In re Lynch*, *supra*, 8 Cal.3d at p. 424.) Alexander committed his offenses when he was in his 30s, and after already suffering the consequences of his discharge from the military. Even if Alexander did not commit all the misconduct found by the military, his discharge still put him on notice of the ramifications of misbehavior. Alexander's criminal conviction, even on a relatively minor charge, should have reinforced this lesson. We do not see the other circumstances of Alexander's life as changing the equation. Given that Alexander committed his offenses alone, over the span of several years well into mature adulthood, and molested Doe 2 starting when she was around five or six years old and Doe 1 when she was eight years old, we do not view Alexander's partially sympathetic personal history as casting any doubt on the proportionality of his sentence, especially in light of the nature of his offenses.

## III.   DISPOSITION

The trial court's judgment is affirmed.


BROWN, J.


WE CONCUR:

STREETER, ACTING P. J.
TUCHER, J.


*People v. Alexander* (A156739)

32